**SPRINGS INDUSTRIES, INC., a South Carolina corporation, Plaintiff–Appellee,**

**v.**

**KRIS KNIT, INC., a California corporation, Defendant,**

**and**

**Jack Chambers, an individual, Defendant–Appellant.**

No. 88–6326.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided July 26, 1989.

Anthony Young, Santa Monica, Cal., for defendant-appellant.

John L. Flowers, Darling, Hall, & Rae, Los Angeles, Cal., for plaintiff-appellee.

Before POOLE, BEEZER and TROTT, Circuit Judges.

POOLE, Circuit Judge:

Appellee Springs Industries, Inc. ("Springs") manufactured "ultra-suede" fabric which it sold to Kris Knit, Inc. ("Kris Knit") for use in Kris Knit's manufacturing operation. In March 1977, appellant Jack Chambers, the director and principal shareholder of Kris Knit, signed an agreement to personally guarantee Kris Knit's commercial account with Springs. Chambers signed the agreement to enable Kris Knit to purchase ultra-suede on credit from Springs.

The guarantee agreement provided, in relevant part:

> I the undersigned agree to be ... jointly and severally primarily and unconditionally liable to [Springs] for the due performance of [Kris Knit's] present and future agreements, contracts or purchase orders with [Springs], including any and all renewals, continuations, modifications, supplements and amendments thereof....

> This is a continuing agreement and shall apply to future as well as present transactions, notwithstanding the death of any of the undersigned ... until actual receipt by [Springs] from the undersigned by registered mail of written notice of termination....

> This instrument cannot be changed or terminated orally [and] shall be interpreted according to the laws of the State of New York....

Springs' Opposition Brief at 42.

In November 1977, Chambers withdrew from participation in Kris Knit and sold his interest therein to Lianne Von Fricht. Chambers contends that, upon selling his interest in Kris Knit, he orally informed a representative of Springs that he wished to terminate his guarantee agreement. After Chambers's departure, Springs continued to sell its products to Kris Knit. Springs and Kris Knit eventually modified their sales arrangement such that Kris Knit also purchased ultra-suede from Springs on a wholesale basis. Kris Knit's commercial indebtedness to Springs increased substantially as a result of the wholesale sales.

In 1986, Kris Knit became insolvent while owing Springs approximately $63,000. After Kris Knit failed to pay the balance due, Springs notified Chambers that he was liable for Kris Knit's debt.[1] Chambers refused to pay, and Springs instituted this action.

On December 12, 1986, Springs filed a complaint in the Central District of California against Kris Knit and Jack Chambers, seeking recovery for breach of contract. Kris Knit failed to answer the complaint. Chambers claimed that Springs was precluded from recovery under two separate theories. First, Chambers alleged that he had orally terminated the guarantee agreement in 1977. Second, Chambers contended that the material alteration in the course of dealing between Springs and Kris Knit had excused him from his guarantee. Springs countered that Chambers's guarantee was a fully-integrated, unambiguous agreement which, under New York law, could only be terminated by written notice as specified in the guarantee agreement. On July 12, 1988, the district court granted Springs's motion for summary judgment and entered a judgment of $91,280 against Chambers. Chambers now appeals the district court's grant of summary judgment.

## DISCUSSION

In granting Springs' motion for summary judgment, the district court held that under New York law[2] the guarantee could be terminated only by written notice. Chambers quarrels with this conclusion and contends that he raised genuine issues of material fact concerning: (1) whether the guarantee was orally terminated in 1977; and (2) whether the material alteration in the course of dealing between Springs and Kris Knit discharged Chambers from his guarantee. This court reviews a grant of summary judgment de novo. *Bonner v. Lewis*, 857 F.2d 559, 561 (9th Cir.1988).

This court also reviews a district court's interpretation of state law de novo. *State Farm Fire and Casualty Co. v. Estate of Jenner*, 856 F.2d 1359, 1362 (9th Cir.1988).

In *Chemical Bank v. Sepler*, 60 N.Y.2d 289, 457 N.E.2d 714, 469 N.Y.S.2d 609 (1983), an officer of a closely-held corporation (Sepler), signed an agreement to guarantee the corporation's obligations to Chemical Bank. The agreement provided that Sepler was liable to the bank for all existing and future obligations of the corporation to the bank and that the guarantee could be terminated only by written notice sent by registered mail. *Id.*, 60 N.Y. 2d at 293, 457 N.E.2d 714, 469 N.Y.S.2d 609. The bank made a loan to the corporation which was repaid within two years. After the loan was repaid, several of the corporation's suppliers sold to the bank their accounts receivable due from the corporation. The corporation eventually defaulted on these obligations and the bank brought suit against Sepler. Sepler argued that he should not be liable to the bank because he guaranteed only particular loans of the corporation which had already been repaid. The New York Court of Appeals disagreed and held that:

> Where, as here, a guarantee is continuing, applicable to after-acquired obligations and terminable only by writing, it may not be said to have terminated due to lack of further consideration, or cessation of what one party may have regarded as the 'business relationship.' A single, unlimited, continuing guarantee, supported by consideration given once and for all time, is not automatically terminated by a change in the parties' relationship.

*Id.* at 294, 457 N.E.2d 714, 469 N.Y.S.2d 609 (footnote omitted).

■ Under *Chemical Bank*, neither Chambers's attempted oral termination nor the modified course of dealing between

---

**1.** Von Fricht was unable to pay the debt because she had declared bankruptcy earlier in 1986.

**2.** The guarantee agreement provided that it "shall be interpreted according to the laws of New York". The district court and the parties all agreed that New York law should be applied

to resolve the dispute. Due to the unambiguous choice of law provision stated in the contract and in the absence of any considerations which would counsel application of the law of another forum, we find that New York law is appropriate for the present case.

Springs and Kris Knit excused Chambers from his guarantee agreement. Chambers's attempted oral termination in 1977 was ineffective because the guarantee agreement expressly provided that it could not be orally terminated and that it would remain in force until Springs received written notice of termination by registered mail. In the face of these express contractual provisions, any attempt to orally terminate the contract was "at odds with both the terms of the [guarantee] and the applicable law." *Id.*

■ The modification in the course of dealing between Springs and Kris Knit was also insufficient to excuse Chambers from his guarantee. Chambers cites *Becker v. Faber*, 280 N.Y. 146, 19 N.E.2d 997 (1939), for the proposition that an alteration in the underlying contractual agreement excuses the guarantor of his obligation. However, where the guarantee agreement unambiguously states that the guarantee applies to any modification of terms, the guarantor is not excused by subsequent modifications. *See Machinery Funding Corp. v. Stan Loman, Inc.*, 91 A.D.2d 528, 456 N.Y.S.2d 401, 402 (N.Y.App.Div.1982). The guarantee agreement stated that Chambers would be liable to Springs for Kris Knit's present and future obligations including any and all renewals and modifications. Although enforcement of the guarantee against Chambers may be inequitable in light of the subsequent modifications in Springs' and Kris Knit's course of dealing, Chambers at all times "had the power to extinguish any perceived inequity: [he] could simply have

served a written notice of termination upon [Springs]. [His] failure to do so cannot give rise to an equitable claim." *Chemical Bank*, 60 N.Y.2d at 294–95, 457 N.E.2d 714, 469 N.Y.S.2d 609.

A fair reading of the New York Court of Appeals' decision in *Chemical Bank* requires us to hold that Chambers remained liable under the guarantee agreement, notwithstanding his attempted oral termination and the modified course of dealing between Springs and Kris Knit.[3] While application of *Chemical Bank* may seem to produce a harsh result, we are bound by the determination of the New York Court of Appeals in this diversity case. Because Chambers has alleged no facts which, under New York law, would terminate his liability under the guarantee agreement, the district court properly granted summary judgment to Springs.

AFFIRMED.

TROTT, Circuit Judge, dissenting:

In March 1977, Jack Chambers executed in favor of Springs Industries, Inc. ("Springs") a personal guarantee which provided that "[i]n consideration of ... accepting orders from, entering into contracts and agreements with or extending credit or making sales of goods and merchandise to Kris Knit," Chambers would unconditionally guarantee payment of all existing or future extensions of credit by Springs to Kris Knit. In addition, the guarantee stated that it could not be terminated without written notice to Springs.

---

3. The dissent ignores *Chemical Bank* and instead relies upon *Bankers Trust Hudson Valley, N.A. v. Christie*, 68 A.D.2d 969, 414 N.Y.S.2d 787 (N.Y.App.Div.), *on reargument*, 72 A.D.2d 614, 420 N.Y.S.2d 521 (N.Y.App.Div.1979). In *Bankers Trust*, the court determined that an officer/shareholder of a closely-held corporation, who had agreed to personally guarantee the obligations of the corporation, could terminate his guarantee agreement in a manner inconsistent with the express provisions of the agreement. *Bankers Trust*, 414 N.Y.S.2d at 789. In contrast, *Chemical Bank* held that the personal guarantee of a similarly situated guarantor could be terminated only as provided by the express terms of the guarantee agreement. *Chemical Bank*, 60 N.Y.2d at 293–95, 457 N.E.2d 714, 469 N.Y.S.2d 609. To the extent that *Bankers Trust*, a 1979 decision of the Appellate Divi-

sion of the New York Supreme Court, conflicts with *Chemical Bank*, a 1983 decision of the New York Court of Appeals, *Bankers Trust* is overruled. Therefore, the dissent's reliance on *Bankers Trust* is without foundation.

The dissent's attempt to invoke the doctrines of waiver and estoppel is similarly unfounded. *Chemical Bank* explicitly held that a guarantor's failure to terminate a guarantee agreement in accordance with the provisions of the agreement could not give rise to an equitable claim. *Id.* at 294–95, 457 N.E.2d 714, 469 N.Y.S.2d 609. Although we agree that the equities of this case provide a strong argument for the use of waiver and estoppel, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we are compelled to follow the New York Court of Appeals' unambiguous holding in *Chemical Bank*.

Subsequently, but only for a very short time, Springs proceeded to conduct business with Kris Knit on a credit basis. Periodically, Chambers was required to submit personal financial statements to Springs in order to maintain the viability of his personal guarantee.

In mid–1977, Chambers suffered a major heart attack, and, based upon medical advice, he withdrew from any active role in the operation of Kris Knit, selling his entire interest in the corporation to Lianne Von Fricht. During his hospitalization and recuperation, Chambers was contacted by agents of Springs, including its president, Abe Waters, and credit manager, Jay Smith. They were made aware by him of the seriousness of his condition and the fact that he was withdrawing from participation in the operation of Kris Knit. They were further informed by Chambers that, while he would remain responsible for any debts existing at the time of his sale of the business to Ms. Von Fricht, he would not be liable for any further credit extended to Kris Knit.

Immediately thereafter, the business relationship between Springs and Kris Knit changed dramatically. Chambers did withdraw from Kris Knit. Springs ceased to require financial statements from him and withdrew the extension of all credit to Kris Knit, insisting that all purchases be solely on a "cash before delivery" basis.

Springs continued to do business with Kris Knit until May 1986, eventually reestablishing a credit relationship with them at some point in the interim.

In 1986, approximately *nine years* after Chambers orally informed Springs that he was terminating his personal guarantee, Kris Knit became indebted to Springs in the sum of $63,404.09[1] After Kris Knit failed to pay the balance due and Ms. Von Fricht personally declared bankruptcy, Springs instituted this action against Chambers.

In answering Springs' complaint as well as in opposing its motion for summary judgment based on the guarantee agreement, Chambers contended that the agreement had been terminated in 1977, prior to the debts that Kris Knit subsequently incurred. In so contending, Chambers relied primarily on estoppel and waiver. Springs, on the other hand, relied solely upon the provision of the agreement that it would continue in full force and effect "until actual receipt by [Springs] from the undersigned by registered mail of written notice of termination."

Under New York law, a party to a contract may be precluded from insisting upon strict compliance by conduct amounting to a waiver or estoppel. The doctrine of estoppel was explained by the Court of Appeals of New York as follows:

> An estoppel 'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury.' ... It is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 451 N.Y.S. 2d 663, 667, 436 N.E.2d 1265, 1269 (1982) (citations omitted). While estoppel requires detriment to the party claiming to have been misled, the doctrine of waiver "requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust,* 451 N.Y.S.2d at 668, 436 N.E.2d at 1269–70 (citations omitted).

Both of these doctrines have been utilized by the New York courts in order to relieve an aggrieved party to a contract involving "distinctly unfair" circumstances. *See Peter A. Camilli & Sons, Inc. v. State of New York*, 41 Misc.2d 218, 245 N.Y.S.2d 521, 527 (N.Y.Ct.Cl.1963) (*Camilli* ). Both doctrines have similarly been applied to contracts involving a written guarantee of payment. *See Bankers Trust Hudson*

---

**1.** There is an indication in the record that the nature of the business relationship between Springs and Kris Knit changed markedly in 1986, resulting in this indebtedness.

*Valley, N.A. v. Christie,* 68 A.D.2d 969, 414 N.Y.S.2d 787 (N.Y.App.Div.), *on reargument,* 72 A.D.2d 614, 420 N.Y.S.2d 521 (N.Y.App.Div.1979) (*Bankers Trust*). In *Bankers Trust,* a case involving substantially identical facts to the case before us, defendant Christie executed a guarantee to the plaintiff for all credit extended to a corporation of which defendant was a stockholder and officer. The guarantee expressly provided that it would continue "until written notice of revocation ... [is] actually received by the [plaintiff]." *Id.,* 414 N.Y.S.2d at 788.

Shortly after execution of the guarantee, defendant Christie withdrew from active participation in the corporation. There was no evidence that written revocation of the guarantee agreement was ever received by plaintiff.

Almost a year after Christie's resignation, the plaintiff loaned the corporation $23,000 at 9% interest. Almost two years later, the plaintiff made a second loan of $4,300 to the corporation. The corporation subsequently defaulted on both loans and the plaintiff commenced an action against Christie to recover over $25,000 on his guarantee agreement.

Despite the lack of any written revocation, Christie contended that he effectively had revoked his guarantee prior to plaintiff's extensions of the loans. He argued that plaintiff was aware of his severance with the corporation and that credit was not extended to the corporation until long after he left. The trial court, however, rejected these arguments and granted summary judgment in favor of plaintiff.

On appeal, the judgment of the trial court was reversed. The Appellate Division of the Supreme Court determined that "although an offer of suretyship provides that it can be revoked only by written notice, the surety has the power to termi-

nate it by giving notice in any other way, unless he has received consideration." *Id.,* 414 N.Y.S.2d at 789 (citations omitted). The Appellate Division found that because Christie had "personally received no consideration for signing the guaranty," he had the power to terminate it by giving notice in some other way. *Id.* Because a question of fact existed as to whether plaintiff was aware that defendant had terminated his guarantee, the Appellate Division reversed the summary judgment, stating:

> In the case at bar, plaintiff seeks to impose liability upon an uncompensated surety for credit issued long after execution of the guaranty and separation from the principal debtor by [defendant]. It is an unjust result, particularly in the procedural posture of this case. On a motion for summary judgment, the court's function is to find issues, not determine them.... Since the allegations contained in the pleadings raise substantial fact questions requiring a trial for their resolution, the judgment should be reversed.

*Id.* (citation omitted).[2]

The teaching of *Camilli* is also telling on this issue. I quote directly from that case:

> There is another ground upon which the Authority is precluded in this case from insisting on a strict compliance with the language of the contract. True, an agent cannot enlarge upon the powers conferred upon him by his own acts.
>
> However, a party to a contract may be precluded from insisting on strict compliance by conduct amounting to a waiver or estoppel....
>
> The waiver may be in writing or by conduct which estops the owner from insisting upon strict compliance with a contractual provision.

*Camilli,* 245 N.Y.S.2d at 527 (citations omitted).

**2.** The majority asserts that *Bankers Trust* has been impliedly overruled by the memorandum decision of the New York Court of Appeals in *Chemical Bank v. Sepler,* 60 N.Y.2d 289, 457 N.E.2d 714, 469 N.Y.S.2d 609 (1983). An examination of the abbreviated decision in *Chemical Bank* fails to disclose any such intent, nor, indeed any mention of *Bankers Trust* at all. This, in my view, is because the issues before the court in *Chemical Bank* were different than the

issues raised in *Bankers Trust.* It appears that the only concerns of the court in *Chemical Bank* were whether 1) the guarantee was continuing in nature, and 2) whether an oral rather than written notice could terminate it. Nowhere in the opinion is there any mention of waiver or estoppel, which do not appear to have been explicitly raised as defenses. This distinguishes *Chemical Bank* both from *Bankers Trust* as well as from the case before us.

In the present case, the facts offered to be proved by Chambers, and, incidentally, never disputed by Springs, create at a minimum a genuine issue which should be addressed at trial. The issue, as it is described by Chambers, is whether Springs by its conduct had waived the written notice provision of the guarantee agreement such that it was estopped from relying on it many years later when Kris Knit and its new owner became insolvent. Chambers' offer of proof below included:

(1) Springs was aware that the guarantee called for written revocation;

(2) Springs' conduct in response to Chambers' oral revocation was such as to justify Chambers' belief that he was no longer responsible for Kris Knit's debts; and

(3) Chambers clearly relied on Springs' forbearance to his ultimate detriment.

This case, in short, provides a textbook example of the doctrines of waiver and estoppel. The advantage that Springs seeks over Chambers is unconscionable. Had he known that Springs intended to hold him responsible for Kris Knit's debts, it is highly unlikely that he would have permitted this indebtedness to occur.

I am reminded by this case of the struggle between equity and law that was played out in England between the fourteenth and nineteenth century, a struggle prompted by the extreme rigidity of the law coming out of the thirteenth century. Put simply, the forms of action in place at that time frequently produced unjust or inequitable results, and a whole new system sprang up to fill a need and an obvious void in their system of civil justice. There are few law students in this nation who have not read the story of *Courtney v. Glanvil*, Cro. Jac. 345, 79 Eng.Rep. 294 (K.B. 1615), wherein the resulting battle between the Kings' Bench, with Coke as its Chief Justice, and the chancellor, Lord Ellsmere, came to a head. A commission to which this stalemate was referred for resolution sliced the baby in half without extinguishing its life, ruling that "the chancery

'does not assume to undo the judgment, but only to restrain the corrupt conscience of the party.'" F. James and G. Hazard, *Civil Procedure* 17 (2d ed.1977), quoting Phelps, *Falstaff and Equity* 45–46 (1901).

Equity and law were finally merged into a single system both in England and the United States, starting in 1848. Ironically for this case, the first step towards this merger came in New York State in 1848. David Dudley Field led the way with the implementation of the Code of 1848.[3] Yet Chambers might well believe that he is still in fourteenth century England where the strict letter of the law ruled supreme and tolerated no equitable relief. As is the majority, I am concerned about the sanctity of contract, but I do not see this case as violating that principle.

Because issues of material fact exist regarding applicability of these doctrines, the judgment of the district court should be REVERSED.

---

**3.** The federal courts followed suit on September 16, 1938, with the Enabling Act, now 28 U.S.C. § 2072. James and Hazard at 20.